## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DARRION BRANSCOMB,

      **Plaintiff,**

      v.                               **CASE NO.  23-3159-JWL**

(FNU) TROLL, et al.,

      **Defendants.**


## MEMORANDUM AND ORDER TO SHOW CAUSE

Plaintiff, a federal prisoner, brings this pro se civil rights action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Although Plaintiff is currently housed at the Rochester Federal Medical Center in Rochester, Minnesota, his claims arose during his incarceration at USP-Leavenworth in Leavenworth, Kansas ("USPL").  The Court granted Plaintiff leave to proceed in forma pauperis.  On August 7, 2023, the Court entered a Memorandum and Order to Show Cause (Doc. 9) ("MOSC") granting Plaintiff an opportunity to show good cause why his Complaint should not be dismissed or to file an amended complaint to cure the deficiencies set forth in the MOSC.  Plaintiff filed an Amended Complaint (Doc. 10), and on September 7, 2023, the Court entered a Memorandum and Order (Doc. 11) ("M&O") finding that the proper processing of Plaintiff's claims in his Amended Complaint cannot be achieved without additional information from appropriate officials of USPL.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  Accordingly, the Court ordered the USPL officials to prepare and file a *Martinez* Report.  The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 11,

at 4.)  The *Martinez* Report (Docs. 13, 14) (the "Report") has now been filed.  The Court's screening standards are set forth in detail in the Court's MOSC.

## 1.  Nature of the Matter before the Court

Plaintiff claims "medical negligence" based on his medical care at USPL. (Doc. 10, at 3.) Plaintiff alleges that he contracted his illness because there was black mold present when he was placed in the SHU at USPL.  (Doc. 10,  at 8.)  Plaintiff alleges that he began to show symptoms and medical staff refused to do anything even though he suffered for several days with reduced breathing, level 9 pain, vision loss, and loss of motor functions.  *Id*.  Plaintiff alleges that medical staff believed he was faking or on drugs.  *Id*.  Plaintiff was only given Ibuprofen.  *Id*.  Plaintiff lost consciousness several times and experienced severe pain over the course of months until he was admitted to St. Luke's Hospital where he was diagnosed with myasthenia gravis "which is linked directly to the black mold in Leavenworth SHU and living quarters in the prison."  *Id*.

Plaintiff claims that in August 2021, he returned to USPL from St. Luke's Hospital, where he received his diagnosis.  *Id*. at 6–7.  When he returned to USPL, he spoke to AHSA P. Viscon and was told that there was nothing medical staff could provide for Plaintiff and that Plaintiff would have to deal with his issues on his own until he was transferred to another facility.  *Id*.  Plaintiff spoke to the Warden about Plaintiff's conversation with Viscon, and was referred to HSA J. Revier, who supported her medical staff's position with respect to Plaintiff's pleas for medical attention.  *Id*.

Plaintiff names Health Service Administrator J. Revier and Health Service Administrator P. Viscon as defendants.[1]  *Id*. at 1–2.  Plaintiff seeks $5 million in compensatory damages.  *Id*. at 5.

---

[1] The Report provides that Revier and Viscon are civilians, and are not members of the Public Health Service. (Doc. 13–1, at 2.)

## II.  The Report

The Report provides that Plaintiff was housed at USPL from May 8, 2019 to November 23, 2021, when he was transferred to FMC Rochester.  (Doc. 13–1, at 2; Exhibit 2.) The Report acknowledges that Plaintiff has exhausted his administrative remedies.  *Id*. at 5.

The Report addresses the medical care Plaintiff received at USPL as follows:

> On August 3, 2020, Plaintiff was seen at the USP Leavenworth Health Services Clinic ("Clinic") for chest pain. *See* Exhibit 5, ¶ 10, Affidavit of Dr. Jason Clark ("Clark Affidavit") & Exhibit B of Clark Affidavit. Plaintiff informed the providers that he had chest pain for months and that it occurs every night at 7pm. *Id*. Plaintiff was advised to take over the counter pain relievers and the provider ordered an electrocardiogram test (EKG). *Id*.
>
> On August 11, 2020, Plaintiff was seen in the Clinic for a follow-up after having an EKG.  *See* Exhibit 5, ¶ 11, Clark Affidavit & Exhibit C of Clark Affidavit. The EKG indicated that Plaintiff had pericarditis, which is swelling and irritation of the tissue around the heart. *Id*.  Pericarditis is usually mild and goes away without treatment. *Id*. Plaintiff was treated with ibuprofen. *Id*.
>
> On August 21, 2020, Plaintiff was seen in the Clinic after complaining of chest pain, dizziness, and fatigue. *See* Exhibit 5, ¶ 12, Clark Affidavit & Exhibit D of Clark Affidavit.  Plaintiff had another EKG, which showed no changes from the previous EKG. Id. Plaintiff was advised to eat when taking ibuprofen and to drink plenty of water. *Id*.
>
> On October 27, 2020, Plaintiff was seen in the Clinic for follow-up regarding his pericarditis. *See* Exhibit 5, ¶ 13, Clark Affidavit & Exhibit E of Clark Affidavit. Plaintiff informed the provider that his chest pain was "very little to non-existent." *Id.* The provider ordered a consult for a prosthetic provider for Plaintiff to obtain a brace to assist with his foot drop stemming from his automobile accident. *Id.*
>
> On December 28, 2020, Plaintiff was seen by medical staff following Plaintiff's involvement in an altercation with another inmate. *See* Exhibit 5, ¶ 14, Clark Affidavit & Exhibit F of Clark Affidavit. Plaintiff informed medical staff that he was hit in the back, which resulted in pain. *Id.* The provider did not note any injuries to Plaintiff's head, neck, face, back, torso, arms, hands, or lower legs. *Id.*

On February 4, 2021, Plaintiff was seen in the Clinic for treatment of chronic acne. *See* Exhibit 5, ¶ 15, Clark Affidavit & Exhibit G of Clark Affidavit.

On February 8, 2021, Plaintiff was seen in the Clinic at the request of the Correctional Officer in Plaintiff's housing unit after Plaintiff stated that he believed he had a stroke. *See* Exhibit 5, ¶ 16, Clark Affidavit & Exhibit H of Clark Affidavit. Plaintiff complained of vision problems and having weakness. *Id.* Plaintiff informed the provider that he believed he had a stroke approximately three weeks prior and was experiencing weakness on his right side and double vision. *Id.* Upon examination, Plaintiff's right-hand grip strength was found to be less that his left hand. *Id.* Plaintiff's speech was normal and his face was symmetrical. *Id.* The provider consulted with optometry and other providers as the institution to schedule follow up consultations for Plaintiff. *Id.*

On February 8, 2021, Plaintiff was seen by an Optometry provider. *See* Exhibit 5, ¶ 17, Affidavit of Clark Affidavit & Exhibit I of Clark Affidavit. Plaintiff was observed to have intermittent exotropia, which is a misalignment of the eyes. *Id*. Dr. Clark referred Plaintiff for an MRI of the brain. *Id.*

On March 10, 2021, Plaintiff was seen in the Clinic by Dr. Clark for an evaluation. *See* Exhibit 5, ¶ 18, Affidavit Clark Affidavit & Exhibit J of Clark Affidavit. Plaintiff was observed to have less strength in his right arm and hand compared to his left side. *Id.* Plaintiff complained of having cross-eyed vision when walking that resolved when he sits and rests. *Id.* Plaintiff informed Dr. Clark that he had suffered a massive head injury in the 2008 automobile accident, but he believed that his strength had recovered except for his right leg. *Id.* Dr. Clark indicated that he would obtain follow up testing of Plaintiff's nerves and endocrine system. *Id.*

On March 12, 2021, Plaintiff was seen by Physical Therapy where it was observed that Plaintiff had very weak upper extremity and hand strength. *See* Exhibit 5, ¶ 19, Clark Affidavit & Exhibit K of Clark Affidavit.

On April 22, 2021, Plaintiff was seen by a provider in his housing unit (the Special Housing Unit (SHU)), where Plaintiff complained of continued weakness and decreasing strength. *See* Exhibit 5, ¶ 20, Clark Affidavit & Exhibit L of Clark Affidavit. Plaintiff provided an opinion that the cause of his symptoms was from the movement of a bullet that remained lodged in his back from a previous gunshot wound. *Id*. The provider referred Plaintiff to physical therapy which was supposed to resume following his release from the SHU. *Id*.

On May 1, 2021, Plaintiff was seen by a provider in his

housing unit after the Correctional Officer in Plaintiff's housing unit contacted Health Services following Plaintiff's complaints of breathing problems and his throat swelling up. *See* Exhibit 5, ¶ 21, Clark Affidavit & Exhibit M of Clark Affidavit. Plaintiff was observed by the housing unit staff of being able to speak and did not appear in distress. *Id*. The provider observed Plaintiff sitting at a computer and speaking with other people. *Id*. The provider then returned approximately forty-five minutes later and observed Plaintiff still sitting at a computer, speaking with others, and moving his extremities. *Id*.

On May 3, 2021, Plaintiff was seen in the Clinic after another took Plaintiff to the Clinic via wheelchair. *See* Exhibit 5, ¶ 22, Clark Affidavit& Exhibit N of Clark Affidavit. Plaintiff stated that he "can't breathe" and that his throat hurt. *Id*. Plaintiff informed the provider that he had been having trouble eating and drinking because fluids sometimes come out his nose. The provider reviewed Plaintiff's most recent labs and diagnostic testing and referred Plaintiff to purchase over-the-counter medications for sinus issues. *Id*.

On May 4, 2021, Plaintiff was seen by a provider in his cell after Health Services was notified that Plaintiff was found to be in a lethargic state in his cell. *See* Exhibit 5, ¶ 23, Clark Affidavit & Exhibit N of Clark Affidavit. Plaintiff informed the provider that he tried to drink water but that it came out his nose as he was too weak to swallow. *Id*. Plaintiff was given hydration via an IV. *Id*. Plaintiff was seen later that day by Dr. Clark who noted that Plaintiff appeared dehydrated, but Plaintiff reported that he felt better following his IV. *Id*. Dr. Clark referred Plaintiff for an exam by an Ear, Nose, and Throat (ENT) doctor. *Id*.

On May 5, 2021, Plaintiff was seen by Dr. Clark and another provider after it was reported that Plaintiff was unable to walk and had urinated on himself. *See* Exhibit 5, ¶ 24, Clark Affidavit & Exhibit O of Clark Affidavit. The provider observed that Plaintiff was more alert and oriented compared to the day before. *Id*. Plaintiff was observed to have difficulty moving and he was noted to have lost weight (26 pounds). *Id*. Dr. Clark ordered labs and stated that Plaintiff would be referred to Neurology. *Id*. Plaintiff was prescribed Omeprazole for possible acid reflux. *Id*.

On May 9, 2021, Plaintiff was examined in his housing unit by one of the institution's EMTs following a report that Plaintiff complained he was too weak to stand up. *See* Exhibit 5, ¶ 25, Clark Affidavit & Exhibit Q of Clark Affidavit. The provider found Plaintiff to not be in an acute state of distress. *Id*.

On May 11, 2021, Dr. Clark entered a note in Plaintiff's chart indicating that he spoke with a physician at St. Luke's regarding Plaintiff's condition. *See* Exhibit 5, ¶ 26, Clark Affidavit

& Exhibit R of Clark Affidavit. Dr. Clark was advised to send Plaintiff to St. Luke's emergency room for evaluation. *Id*. Plaintiff was sent out that same day to St. Luke's. Plaintiff's testing and diagnostic, which indicated "no acute or concerning abnormalities." *Id*.

On June 1, 2021, Plaintiff was seen in the Clinic after it was reported that Plaintiff fell in his housing unit and suffered a cut above his eye. *See* Exhibit 5, ¶ T, Clark Affidavit & Exhibit T of Clark Affidavit. The wound was cleaned and bandaged. *Id*.

On June 1, 2021, Plaintiff was seen by ENT, which conducted testing. *See* Exhibit 5, ¶ 28,  Clark Affidavit & Exhibit U of Clark Affidavit. The ENT's impression was that Plaintiff had dysphagia and GERD. *Id*.

On June 2, 2021, Plaintiff had nerve testing (EMG) conducted by a neurologist. *See* Exhibit 5, ¶ 29, Clark Affidavit & Exhibit V of Clark Affidavit. The EMG findings were nonspecific. *Id*.

On June 9, 2021, Plaintiff was seen by Dr. Clark for a follow up exam regarding his continuing symptoms. *See* Exhibit 5, ¶ 30, Clark Affidavit & Exhibit W of Clark Affidavit. Dr. Clark noted that Plaintiff had difficulty moving from a sitting position to a standing or lying position. Id. Plaintiff also had reduced grip strength and poor bicep and tricep strength. *Id*.

On June 15, 2021, Plaintiff was seen in the Clinic due to complaints of him being unable to breathe. *See* Exhibit 5, ¶ 31, Clark Affidavit & Exhibit X of Clark Affidavit. Plaintiff had shallow breathing and a low pulse ox. *Id*. Plaintiff was treated with a nebulizer with little improvement. *Id*. Plaintiff was transferred to a local hospital for evaluation. *See* Exhibit 5, ¶ 31, Clark Affidavit & Exhibit Y of Clark Affidavit. He was admitted to the hospital with shortness of breath and low pulse ox. *Id*. Testing revealed a mediastinal mass compressing Plaintiff's superior vena cava. *Id*.

During Plaintiff's inpatient stay at St. Luke's, the mass in his chest was determined to be caused by histoplasmosis. *Id*. Further, he was evaluated by neurology and diagnosed with myasthenia gravis. Id. Treatments were begun for each of the conditions. *Id*.

On June 30, 2021, Plaintiff returned to USP Leavenworth from St. Luke's Hospital. *See* Exhibit 5, ¶ 32, Clark Affidavit & Exhibit Z of Clark Affidavit. His condition improved with him gaining some weight, strength, and mobility. *Id*. Plaintiff was reported to be in good spirits and optimistic. *Id*.

On July 22, 2021, Plaintiff was found to be taking his myasthenia gravis medication (pyridostigmine) too frequently and not in compliance with the dosing instructions. *See* Exhibit 5, ¶ 33, Clark Affidavit & Exhibit AA of Clark Affidavit. This medication

was switched from him having possession of it in his cell to him receiving his doses from staff at pill line to ensure compliance. *Id*.

On July 28, 2021, Plaintiff was seen at the Hanger Clinic for evaluation for a brace for his foot drop. *See* Exhibit 5, ¶ 34, Clark Affidavit & Exhibit BB of Clark Affidavit.

On August 2, 2021, Plaintiff was seen by Dr. Clark for a follow up regarding his myasthenia gravis. *See* Exhibit 5, ¶ 35, Clark Affidavit & Exhibit CC of Clark Affidavit. Plaintiff reported that he feels weak a few hours after taking his medication. *Id*. Dr. Clark increased Plaintiff's dosing of pyridostigmine. *Id*.

On August 6, 2021, Plaintiff was seen by a neuromuscular surgeon who recommended monthly IV immunoglobulin infusion treatments. *See* Exhibit 5, ¶ 36, Clark Affidavit & Exhibit DD of Clark Affidavit. The treatment of Plaintiff's myasthenia gravis was complicated by the mass caused by histoplasmosis. *Id*.

On August 10, 2021, Plaintiff had a CT scan of his chest which revealed the mediastinal mass in his chest had decreased. *See* Exhibit 6, ¶ 37, Clark Affidavit & Exhibit EE of Clark Affidavit.

On August 25, 2021, Plaintiff had a monthly IV immunoglobulin infusion for treatment of his myasthenia gravis. *See* Exhibit 5, ¶ 38, Clark Affidavit & Exhibit FF of Clark Affidavit.

On September 3, 2021, Plaintiff was seen by Dr. Clark due to complaints of right sided chest pain. *See* Exhibit 5, ¶ 39, Clark Affidavit & Exhibit GG of Clark Affidavit. Results of an examination and EKG indicated that Plaintiff was likely having "benign, noncardiac chest pain, likely between the ribs." *Id*.

On September 12, 2021, Plaintiff was seen in the Clinic for injuries sustain[ed] when he fell from his wheelchair and hit his head on the floor. *See* Exhibit 5, ¶ 40, Clark Affidavit & Exhibit HH of Clark Affidavit. Plaintiff's suffered minimal bleeding and the laceration did not require sutures. *Id*.

On September 21, 2021, Plaintiff had a CT scan of his chest. *See* Exhibit 5, ¶ 41, Clark Affidavit & Exhibit II of Clark Affidavit.

On October 8, 2021, Plaintiff was seen by Dr. Clark for a follow up exam regarding his myasthenia gravis. *See* Exhibit 5, ¶ 42, Clark Affidavit & Exhibit JJ of Clark Affidavit. Plaintiff stated that he was "mostly doing better" but is still slow to get going in the morning. *Id*. Dr. Clark increased Plaintiff's dosing of pyridostigmine. *Id*.

On October 23, 2021, Plaintiff had a monthly IV immunoglobulin infusion for treatment of his myasthenia gravis. *See* Exhibit 5, ¶ 43, Clark Affidavit & Exhibit KK of Clark Affidavit.  He was pending transfer to another BOP institution. Id.

On November 23, 2021, Plaintiff was transferred to FMC
Rochester. *See* Exhibit 2.

(Doc. 13–1, at 7–13.)

The Report also provides that when Plaintiff was interviewed for the Report, Plaintiff

indicated that when he returned to USPL after his diagnosis of histoplasmosis and myasthenia

gravis, he was told by Dr. Clark and AHSA J. Revier that there was "nothing we can do for you"

regarding his conditions and that he would be transferred to another institution. *Id*. at 15.

Plaintiff alleged that the providers "brushed him off" and made him walk to pill line, and he fell

and hit his head in July 2021. *Id*. Plaintiff claimed that sometimes he had access to a wheelchair

for when he left his housing unit, but that it was also used by other inmates and was not

exclusively for his use. *Id*. Plaintiff denied that he took his medication off cycle or against dose

instructions. *Id*. Plaintiff claimed the institution pharmacy did not refill the prescription in a

timely manner and therefore he ran out. *Id*. Plaintiff is now allowed to keep his pills in his cell

at FMC Rochester. *Id*.

## III. DISCUSSION

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual

punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle*

*v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective

component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the

objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the

presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at

104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation

omitted).   A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).   Plaintiff has alleged a serious medical need and serious illness.

 "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id*. (quoting *Sealock*, 218 F.3d at 1209).   In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment.  *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm.  *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993).   In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay.  *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted).   "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'"

*Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

Plaintiff must also satisfy the subjective prong.  The Supreme Court has insisted upon actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added).  An apparent disagreement over course of treatment, however, does not rise to the level of a constitutional violation. *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010).  "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory." *Id*. at 1139.  "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Id*. (citations omitted).  Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id*.  "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id*.  (citations omitted).

The Court set forth in the MOSC the medical care provided to Plaintiff at USPL and found that Plaintiff's allegations show that he received medical care that was more than the functional equivalent of a compete denial of care.  The Report supports this conclusion regarding Plaintiff's medical care at USPL.  The Court also cautioned Plaintiff in the MOSC that negligence is insufficient to state a constitutional violation.  The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."  *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

When Plaintiff returned to USPL from St. Luke's Hospital in June 2021, Dr. Clark and other providers had regular follow ups with Plaintiff and monitored his conditions.  Dr. Clark adjusted the dosing of Plaintiff's myasthenia gravis medication on two occasions based on Plaintiff's subjective statements about its effectiveness.  Plaintiff was also sent out into the community for his regular IV immunoglobulin treatments.

Plaintiff's Amended Complaint only names the two Health Service Administrators as defendants.  The Report provides that HSAs do not typically provide clinical treatment of inmate patients.  (Doc. 13–1, at 17.)  "The positions are supervisory and managerial and focus on staffing, procurement, and the overall administration of the department (e.g., budgeting, supply, facilities, contracting)."  *Id*.; Exhibit 6, BOP Program Statement 6010.05, <u>Health Services Administration</u>, pp. 7–10.

## IV.  Response Required

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims."  *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  The report "is treated like an affidavit, and the court is not authorized to accept the

factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)).  Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact.  *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes.").  In light of the Report, the Court is considering dismissal of this matter for failure to state a claim against the two named defendants.

Plaintiff will be given an opportunity to respond to the Report and to show good cause why dismissal should not be entered.  Failure to respond by the Court's deadline may result in dismissal of this action without further notice.  Exhibit 5 to the Report consists of Plaintiff's medical records and was filed under seal in this case.  The Warden, as Interested Party, should ensure that Plaintiff has access to Exhibit 5 for use in preparing his response.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **December 1, 2023,** in which to respond to the Report and to show good cause, in writing to the undersigned, why Plaintiff's claims should not be dismissed for failure to state a claim.

**IT IS FURTHER ORDERED** that the Warden, as Interested Party, should ensure that Plaintiff has access to Exhibit 5 to the Report for use in preparing Plaintiff's response.

**IT IS SO ORDERED**.

**Dated November 3, 2023, in Kansas City, Kansas.**

<u>**S/  John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**